THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

ANDREA COSTENBADER                :
                                  :
        Plaintiff                 :
                                  :
    v.                            :   3:08-CV-2329
                                  :   (JUDGE MARIANI)
DES, PROPERTIES, INC. d/b/a       :
CLASSIC QUALITY HOMES, INC.       :
                                  :
                                  :
        Defendant                 :

## MEMORANDUM AND ORDER

### I. Introduction

Before the Court is Defendant's Motion for Summary Judgment. (Doc. 43). For the reasons set forth below, the Court will deny the motion.

### II. Statement of Facts and Procedural History

In June 2007, David and Emma Wengerd purchased a home construction company from Plaintiff's previous employer, Raymond Bender ("Bender"), who continued to have access to part of the office until December 31, 2007. (Doc. 51, Ex. F, Asset Purchase Agreement).[1] Under Bender, Plaintiff had been a receptionist, but David promoted her to office manager soon after the sale. (Minutes Sheet, Doc. 44, Ex. F; Costenbader Dep., Doc. 44, Ex. E, 97:10-14). Plaintiff alleges that this promotion displeased Maureen Perih, a

---

[1] "Possession of Premises and Vehicles shall be delivered to Buyers on the Closing Date, except that the Sellers reserve free of any rent or charge the right to occupy and use two (2) rooms in the sales office for their own purposes until no later than December 31, 2007." (*Id.* at ¶ 5).

saleswoman. Perih allegedly then spent the next several months trying to persuade David to fire Plaintiff. (DW1 Dep., Doc. 44, Ex. C, 94:4-17).

Between June and November 2007, David was allegedly aware of Bender's violent tendencies. He himself described Bender as "scary." (Id. at 62:23-63:1).[2] AnnMarie Gentile (the plaintiff in the companion case) stated that she had informed David about Bender's sexual comments and inappropriate touching soon after he bought the company. (Gentile Dep., Doc. 51, Ex. I, 152:4-153:12; 159:1-6).

On November 7, 2007, Bender "proceeded to rub himself up and down [Plaintiff's] body." (Costenbader Dep., Doc. 44, Ex. E, 29:9-11). When Plaintiff left the room, Bender followed her and "continue[d] to touch [Plaintiff] inappropriately." (Id. at 30:1-3). Plaintiff alleged at her deposition that David witnessed the first incident but not the second. (Id. at 29:9, 30:4-6). Plaintiff stated that she did not speak to David about the inappropriate touchings on November 7, but Gentile did. (Id. at 30:7-9).

On the 9th, Bender returned to DES and allegedly sexually assaulted Costenbader by shoving his hand down her pants and grabbing her buttocks. (Police Statement, Doc. 44, Ex. H). After the incident, two co-workers, (Gaito and Knott) advised Plaintiff to call the police. Knott also told Bender to leave the premises, and Bender did not return that day.

---

[2] In deciding Defendant's Motion for Summary Judgment, the Court does not rely on any references to David Wengerd's deposition that Plaintiff states is located at Doc. 51, Ex. A. That document is Emma Wengerd's deposition, and so any of Plaintiff's citations to David Wengerd's deposition at that location are incorrect and unverifiable unless contained in Defendant's excerpts from the same deposition, located at Doc. 44, Ex. C. For instance, in his deposition, David Wengerd is said to have acknowledged that he had received reports of Bender's violent tendencies and his disposition towards women long before the events of November 2007. See Plaintiff's Answer to Defendant's Statement of Facts (Doc. 50, ¶ 33, n.13).

2

(Costenbader Dep., Doc. 44, Ex. E, 91:18-94:22). Following Bender's assault on Plaintiff, Gentile called the police. Both Costenbader and Gentile submitted statements to the police on the 10th. (Doc. 44, Ex. H). David was not on the premises at the time of the assault, but he came in later that day and found out what had happened. (DW1 Dep., Doc. 44, Ex. C, 71:12-72:7). He said that Knott "stepped in and we decided we should keep [Bender] off the property." (*Id.* at 115:19-21). Knott claims that the Wengerds "refused to believe Ms. Costenbader and Ms. Gentile, and sided with Mr. Bender. (Knott Aff., Doc. 51, Ex. J, ¶¶ 19-20).[3] David admitted he did not conduct an independent investigation because he felt the police were better equipped to handle the matter. (DW1 Dep., Doc. 44, Ex. C, 118:5-11).

David acknowledged that Gentile had told him about Bender's conduct and Plaintiff's complaints. (DW2 Dep., Doc. 51, Ex. B, 49:9-51:4). However, after his conversation with Gentile, David admitted he did not approach Bender about it because "Bender was like $50,000,000 and I would have been a little guy. I would never dare say anything to Bender." (DW1 Dep., Doc. 44, Ex. C, 61:4-8). He then said he did not do anything after the conversation with Gentile "because [Gentile] put me under the impression that all you had to do was tell him to leave and he would go. So I didn't think it was anything serious at this point." (*Id.* at 61:11-14). David admitted that when Gentile told him about Bender's conduct, he understood her to mean that both she and Plaintiff were bothered by it. David also said that he did not fully believe Gentile because "I guess my idea would have been

---

[3] Knott was also terminated in August 2009 and at the time of his affidavit was involved in a lawsuit against DES for commissions he claims he never received. *Id.* at ¶¶ 33-34.

that, if you want to bother somebody, you would bother some different type of person." To clarify his answer he stated, "I guess somebody a little more attractive." (DW2 Dep., Doc. 51, Ex. B, 51:12-21). He also admitted that he told his wife about the November 9 incident and said, "I don't think Ray Bender would bother because she stinks and she's too fat." (Id. at 59:19-21). His wife confirmed that he had stated "[Plaintiff] smells and he wouldn't know who would want her." (EW Dep., Doc. 51, Ex. A, 48:7-8).

Bender returned to the offices on November 13, 2007, asking "Where is she?" ostensibly referring to Plaintiff (Costenbader Dep., Doc. 44, Ex. E, 40:6-7). A salesman (Hanyon) distracted Bender and got him out of the office by directing him to the warehouse. (Id. at 41:8-14). Bender did not return, and Plaintiff had no contact with him that day. (Id. at 40:16-18, 41:13-15). After Bender left, David told Plaintiff she could go home on administrative leave with pay until David delivered a letter to Bender telling him to stay away from the office. (Id. at 43:16-44:17). He also allegedly apologized for "putting his money ahead of us girls." (Id. at 46:16-18). Costenbader alleges that David delayed delivering the letter until after he had closed sales on some of Bender's houses. (DW1 Dep., Doc. 44, Ex. C, 116:13-17; 116:24-117:14). Costenbader stayed home for the next two days. (Costenbader Dep., Doc. 44, Ex. E at 59:10-13). On the 15th, Plaintiff called David to ask about the letter, and David confirmed that he had personally delivered the letter to Bender.[4] However, David said he still feared for her safety, so he told her to stay at home for another

---

[4] Defendant has not produced this letter as evidence because David's copy was allegedly destroyed in a fire at the office. His attorney who drafted the letter has a brain tumor and has been unable to produce it. (DW1 Dep., Doc. 44, Ex. C, 116:19-23).

4

week with pay (*Id.* at 59:20-60:3). Plaintiff returned to work the next day (16th), because Gentile told her that David was planning to fire her for abandoning her job. (*Id.* at 69:6-24, 75:10; Gentile Dep., Doc. 51, Ex. I, 178:1-19). Plaintiff was terminated on the 17th. (Costenbader Dep., Doc. 44, Ex. E, 64:21-23). Maureen Perih informed Plaintiff she was being laid off temporarily, and David confirmed the layoff when Plaintiff called him that night. (*Id.* at 78:14-79:10; DW1 Dep., Doc. 44, Ex. C, 112:9-113:5). David stated that although he was the final decision-maker to fire Plaintiff, it was more of Perih's decision. (DW1 Dep., Doc. 44, Ex. C, 91:4-5). "I felt that we didn't need three girls in the office and because there was much conflict I let Maureen pick her." (*Id.* at 110:16-18; *see also* Costenbader Dep., Doc. 44, Ex. E, 80:17-24).

Defendant's stated reasons for firing Costenbader were that (1) she was lazy and caused trouble in her role as office manager, (2) her lifestyle as a "swinger" conflicted with Defendant's Christian values, and (3) there was not enough work to justify her presence.

David Wengerd testified that multiple people complained about Costenbader in her new role as office manager. (DW1 Dep., Doc. 44, Ex. C, 91:6-92:1). Later in his deposition, however, David said, "I think Andrea wasn't as bad as the salesmen made it sound." (*Id.* at 92:7-9). Furthermore, David admitted that he had never given any warnings or reprimands to Plaintiff about her leisure reading while at work or her chatter with the secretary. (*Id.* at 104:4-105:7).

5

With respect to Costenbader's alternative lifestyle, David says that Gaito told him in July 2007, soon after David bought DES. (*Id.* at 107:10-13). Defendant also attached photoshots of websites as exhibits to their motion for summary judgment. These website shots show Plaintiff's profile and postings on Swing Life Style. (Doc. 44, Ex. G). However, apart from a notice that Plaintiff had been a member of the site since April 2007, all the postings were from 2009 and 2010, well after Costenbader was terminated. Furthermore, they were printed from the website the day of Costenbader's deposition (October 5, 2010). David testified at his deposition that his wife pestered him daily to fire Costenbader because she did not want Plaintiff around her son, Steven. (DW1 Dep., Doc. 44, Ex. C, 105:20-24, 111:19-112:3). However, Emma testified at her deposition that she did not think she told her husband to do anything about Costenbader upon finding out she was a swinger and that "[i]t was ok with me." (EW Dep., Doc. 51, Ex. D, 66:1-4; 88:14-17).

Finally, within a week of laying off Costenbader on November 17, 2007, Defendant hired a replacement, Megan Perih (Maureen's daughter), who worked nearly full-time hours. (Gentile Dep., Doc. 51, Ex. I, 196:15-24; Costenbader Dep., Doc. 51, Ex. G, 102:15-24).

Plaintiff settled her case separately with Raymond Bender and withdrew the criminal charges against him. (Doc. 44, Ex. L). The Second Amended Complaint (Doc. 23) asserted five counts. However, Plaintiff indicated in her brief in opposition that she is voluntarily withdrawing Counts III, IV, and VI (there was no Count V). She is also withdrawing any claims against David and Steven Wengerd in their individual capacities.

(Doc. 52, at 1, n.1). Thus, the only remaining claims are the sexual discrimination/hostile work environment (I) and retaliation (II) claims against Defendant DES.

### III.   Standard of Review on Motions for Summary Judgment

Through summary adjudication the court may dispose of those claims that do not present a "genuine issue as to any material fact." FED. R. CIV. P. 56(a). Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Turner v. Schering-Plough Corp.*, 901 F.2d 335, 340 (3d Cir. 1990). "As to materiality, ... [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992), *cert. denied* 507 U.S. 912 (1993).

## IV. Analysis

### a. Count I: Sexual discrimination/hostile work environment

Plaintiff is alleging that Defendant took inadequate remedial measures in response to Bender's conduct (i.e. they failed to prevent a hostile work environment). To state a claim under Title VII for discrimination resulting from a hostile work environment, an employee must show that:

> (1) she suffered intentional discrimination because of her [sex]; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected her; (4) it would have detrimentally affected a reasonable person in like circumstances; and (5) a basis for employer liability is present.[5]

*Guthrie v. Baker*, 583 F. Supp. 2d 668, 681 (W.D. Pa. 2008) (citing *Jensen v. Potter*, 435 F.3d 444, 453 (3d Cir.2006), *overruled in part on other grounds by Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 67–68, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006). Based on the facts of record, Plaintiff has alleged Bender engaged in offensive sexual touching multiple times, grabbing her breasts and buttocks, so upsetting her that she would vomit or hide in the bathroom to avoid him. Such conduct could detrimentally affect a reasonable person in similar circumstances, so Plaintiff can easily meet the first four elements of her claim. Whether Defendant is liable is a more difficult question.

An employer is liable under Title VII for harassment of its employees by non-employees such as Bender where it is aware of the problem and fails to take prompt and

---

[5] The fifth element is usually "the existence of *respondeat superior* liability." *Andreoli v. Gates*, 482 F.3d 641, 643 (3d Cir. 2007). However, in this case, Bender was not an agent of DES because he was no longer an owner or employee. Plaintiff has specifically stated she is suing DES for direct, not vicarious, liability.

8

appropriate corrective action. *Faragher v. City of Boca Raton*, 524 U.S. 775, 789, 118 S.Ct. 2275, 2284 (1998) ("the combined knowledge and inaction may be seen as demonstrable negligence, or as the employer's adoption of the offending conduct and its results, quite as if they had been authorized affirmatively by the employer"). EEOC Guidelines also provide that:

> An employer may also be responsible for the acts of non-employees, with respect to sexual harassment of employees in the workplace, where the employer (or its agents or supervisory employees) knows or should have known of the conduct and fails to take immediate and appropriate corrective action.

29 C.F.R. § 1604.11(d-e).

An employer can be liable for the harassing conduct of the victim's harasser if the employer was "negligent or reckless in failing to train, discipline, fire or take remedial action upon notice of harassment." *See Andreoli*, 482 F.3d at 644 (citing *Bonenberger v. Plymouth Twp.*, 132 F.3d 20, 26 (3d Cir.1997) and *Bouton v. BMW of N. Am., Inc.*, 29 F.3d 103, 106 (3d Cir.1994)). Even if the remedial action does not stop the alleged harassment, it is "adequate" if it is "reasonably calculated" to end the harassment. *Knabe v. Boury Corp.*, 114 F.3d 407, 412-13 (3d Cir.1997). The employer also has a duty to investigate whenever it becomes aware of harassment. It is not essential for the victim of harassment to lodge a formal or informal complaint. *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 72, 106 S.Ct. 2399, 2408 (1986) ("Finally, we reject petitioner's view that the mere existence of a

grievance procedure and a policy against discrimination, coupled with respondent's failure to invoke that procedure, must insulate petitioner from liability.").

Bender's contract with Defendant allowed him access to two rooms in the sales office until the end of 2007. (Doc. 51, Ex. F, Asset Purchase Agreement). Under Pennsylvania law, the contract contained an implied duty of good faith and fair dealing, as well as the doctrine of necessary implication. That doctrine, similar to the requirement of good faith, has been described as follows:

> In the absence of an express provision, the law will imply an agreement by the parties to a contract . . . to refrain from doing anything that would destroy or injure the other party's right to receive the fruits of the contract.

*Slater v. Pearle Vision Ctr.*, 546 A.2d 676, 679 (Pa. 1988); *see also Slagan v. John Whitman & Assocs.*, No. Civ.A. 97-3961, 1997 WL 587354, at *5 (E.D. Pa. Sept. 10, 1997) (holding in a sexual harassment case that "Whether under the Restatement's implied duty of good faith performance of a contract or the doctrine of necessary implication, . . . Plaintiff's employment contract contained the implied term that his conduct would be lawful."). Though Bender was not an employee of Defendant, his contract with Defendant contained an implied term that while on the business premises, his conduct would be lawful. Once Bender allegedly breached that duty by sexually harassing Costenbader on November 7, 2007, at the very least, Defendant had a duty to investigate and prevent further harassment to its employees. *Faragher*, 524 U.S. at 789; *Meritor*, 477 U.S. at 72; *Andreoli*, 482 F.3d at 644; *Knabe*, 114 F.3d at 412-13. Because Defendant cannot establish as a matter of law

that he was either unaware of Bender's conduct or that it took prompt and adequate remedial measures, the Court will deny its motion for summary judgment.

Though Costenbader did not directly complain to David of Bender's conduct of November 7 (Gentile did), when he discussed the incidents with her on the 10th, she asked him to keep Bender out of the office. (Costenbader Dep., Doc. 44, Ex. E, 38:7-39:3). Moreover, following the events of November 9, Costenbader filed formal criminal charges against Bender. (Doc. 44, Ex. H). Once David came to the office that day, he learned of the day's events. (DW1 Dep., Doc. 44, Ex. C, 71:12-72:7). Defendant cannot claim lack of notice. Because Defendant was on notice, DES had a duty to investigate the problem. However, David admitted he did not because he allegedly felt the police were better equipped to handle it. (*Id.* at 118:5-11). He also stated he personally delivered a letter to Bender warning him to stay off the property (*Id.* at 59:20-60:3), but Defendant has not produced the letter yet. (*Id.* at 116:19-23). David also waited until closing on some of Bender's homes before delivering the letter (*Id.* at 116:13-17; 116:24-117:14). He also stated at his deposition that he would never dare to say anything against Bender because David was a "little guy" and Bender was $50,000,000.00 (*Id.* at 61:4-8), which is inconsistent with his statement that he personally delivered the letter to Bender and told him to stay away.

Though Bender and Costenbader had no contact when he returned to the office on November 13, Bender was kept away from Costenbader not through the employer's action

11

but because one of the salesman intervened to distract Bender. The employer itself took no action to ensure Costenbader was insulated from Bender presence. (*Id.* at 40:16-18, 41:8-15). Finally, whether David took Costenbader's complaints seriously is in grave doubt. David's deposition testimony is replete with references to why he did not believe Costenbader (e.g., she was too fat or smelly to be attractive to anyone). (DW2 Dep., Doc. 51, Ex. B, 51:12-21; 59:19-21; EW Dep., Doc. 51, Ex. A, 48:7-8).

Therefore, Plaintiff has sufficiently made out a case that DES did not take prompt or adequate remedial measures to survive a motion for summary judgment. Drawing all reasonable inferences in favor of Plaintiff, it appears that those who intervened to keep Bender away were fellow co-workers who were not enforcing any policies against sexual harassment, and David's own words belie his alleged concerns for Costenbader's safety.

### b. Count II: Retaliation

To establish a *prima facie* case of retaliation, a plaintiff must establish: (1) that she engaged in protected activity; (2) an adverse action was taken; and (3) there was a causal connection between the protected activity and the adverse action. *Thomas v. Independence Twp.*, 463 F.3d 285, 296 (3d Cir. 2006). Protected activities under Title VII include situations where an employee "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under" 42 U.S.C. § 2000e-3(a). "In certain narrow circumstances, an 'unusually suggestive' proximity in time between the protected activity and the adverse action may be sufficient, on its own, to

establish the requisite causal connection." *Marra v. Philadelphia Housing Auth.*, 497 F.3d 286, 302 (3d Cir. 2007). The alleged instances of Bender's harassment occurred on November 7 and 9, 2007. Along with Gentile, Costenbader filed criminal charges against Bender and submitted a witness statement on November 10, 2007. On November 17, 2007, Costenbader was terminated. The temporal link weighs in favor of finding causation.

If the employee makes a *prima facie* case, the burden shifts to the employer to articulate a legitimate and non-discriminatory or non-retaliatory reason for the adverse employment action. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 1824, 36 L. Ed. 2d 668 (1973); *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 501 (3d Cir. 1997). Here, David Wengerd stated he terminated Costenbader because (1) she was lazy and caused trouble at work, (2) she was a swinger, and such a lifestyle conflicted with his religious beliefs, and (3) there was not enough work to support her position. These proffered reasons could be legitimate and non-discriminatory reasons for termination.

The burden then shifts back to Plaintiff to show that the proffered reasons are pretextual. To do so, the plaintiff must point to either direct or circumstantial evidence from which a fact-finder could reasonably either: (1) disbelieve the employer's articulated legitimate reasons, and (2) retaliation was the real reason for the adverse employment action. *Krouse*, 126 F.3d at 501. Costenbader points to David Wengerd's own deposition testimony stating that he never gave her any written or verbal reprimands regarding any inappropriate behavior on her part. (DW1 Dep., Doc. 44, Ex. C, 104:4-105:7). Any

complaints that he alleged he received are inadmissible hearsay, and other than his word, there is no testimonial evidence to support him. There is also a logical gap between David's insistence that Plaintiff stay home after Bender returned to the office on November 13th and her termination by proxy (via Perih) on the 17th. Furthermore, there is very little evidence that the Wengerds were even aware of her alternative lifestyle at the time of her discharge. All the attached exhibits (Doc. 44, Ex. G) post-date Costenbader's termination and are unduly prejudicial. Finally, within a week of her termination, Defendant hired a replacement for Costenbader working at near full-time hours. (Gentile Dep., Doc. 51, Ex. I, 196:15-24; Costenbader Dep., Doc. 51, Ex. G, 102:15-24). Not only did Defendant replace Costenbader, he hired her rival's daughter, a rival whom David acknowledged had actively lobbied for Costenbader's discharge. (DW1 Dep., Doc. 44, Ex. C, 94:4-17). Drawing all reasonable inferences in favor of Costenbader, a jury could reasonably disbelieve David's stated reasons for Costenbader's termination.

## V. Conclusion

For the above reasons, the Court will deny Defendant's Motion for Summary Judgment. An appropriate order follows.

Robert D. Mariani
United States District Judge